The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

John Arthur DeBELLA, Defendant–Appellant.

Nos. 06CA2630, 07CA1961.

Colorado Court of Appeals, Div VI.

May 14, 2009.

Rehearing Denied June 11, 2009.

John W. Suthers, Attorney General, Alexander C. Reinhardt, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Isaacson Rosenbaum, P.C., Shawn Gillum, Blain D. Myhre, Gary Lozow, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge BERNARD J.

Defendant, John Arthur DeBella, appeals the judgments of conviction entered on jury verdicts finding him guilty of two counts of sexual assault on a child (one as part of a pattern of abuse), two counts of enticement of a child, and one count of possessing an ounce or less of marijuana. Defendant also appeals the trial court's order denying his Crim. P. 35(c) motion for postconviction relief. We affirm.

According to the prosecution's evidence, in 2005, defendant took thirteen-year-old D.W. to a cemetery, performed oral sex on him, and had D.W. reciprocate the act; and, on another occasion, defendant took D.W. to his apartment, performed oral sex on him, and engaged in anal intercourse.

Defendant's theory of defense was that D.W. fabricated the allegations. Defendant pointed to the lack of corroborative evidence, and elicited testimony that D.W. had prior behavioral problems; engaged in attention-seeking behavior; and fabricated various stories, both related and unrelated to this case.

The jury found defendant guilty of all the charged offenses. Before sentencing, he filed a motion for postconviction relief under Crim. P. 35(c), alleging that his counsel had been ineffective during plea negotiations. Prior to ruling on the motion, the court sentenced defendant to concurrent terms of twenty-four years to life on each of the sexual assault charges, six years on each of the enticement charges, and a suspended $100 fine for possessing marijuana.

Following sentencing, defendant filed a notice of appeal. Thereafter, a division of this court granted defendant's motion for limited remand to allow the trial court to consider his pending motion for postconviction relief. On remand, defendant argued that his counsel was ineffective because counsel had failed to convey one plea offer, and inadequately communicated another, to him. Following an evidentiary hearing, the trial court denied defendant's motion.

## I. Direct Appeal

Defendant contends that the trial court committed reversible error when it allowed the jury, during deliberations, unfettered access to a videotaped interview of D.W. that had been admitted into evidence. We disagree.

D.W. was interviewed twice on videotape by a detective and a counselor. Over defendant's objection, the trial court admitted both videotapes. The court decided at a pretrial hearing to admit the first videotape as child hearsay under section 13–25–129, C.R.S.2008. The court admitted the second videotape as a prior inconsistent statement under section 16–10–201, C.R.S.2008, after listening to D.W.'s testimony at trial.

Following closing arguments, the trial court initially indicated that it would give the jury both videotaped interviews and the machinery to play them during deliberations. When the prosecution informed the court that the videotape of the first interview contained material that the jury had not previously been allowed to see, the court ruled that that videotape would not be sent back to

the jury room and that it could be viewed by the jury only upon request and, even then, in open court subject to court supervision and the presence of counsel. However, the court decided that the videotape of the second interview, in which D.W. described in great detail defendant's conduct to groom D.W. for sexual activity as well as the sexual assaults, would be given to the jury.

Defense counsel objected, arguing that (1) the videotape was testimonial evidence from D.W.; and (2) by allowing the jury unrestricted access to it, the jurors would be "able to give[ ] more weight to, or to review it as many times as they feel they want to," unlike "any of the other testimony that was presented during the trial." The court overruled defendant's objection, and did not instruct the jury that there were any limitations on its access to the videotape.

The trial court based its ruling on, inter alia, *People v. McKinney*, 80 P.3d 823 (Colo. App.2003), *rev'd on other grounds*, 99 P.3d 1038 (Colo.2004), and *People v. Isom*, 140 P.3d 100 (Colo.App.2005). In those cases, divisions of this court recounted (1) how, under *People v. Montoya*, 773 P.2d 623 (Colo. App.1989), jurors were not allowed unrestricted and unsupervised access to testimonial exhibits during deliberations; (2) that the *Montoya* division had reached its decision based, in large part, on C.R.C.P. 47(m)'s prohibition on giving the jury a particular type of testimonial exhibit (that is, depositions) during deliberations; (3) that the language of C.R.C.P. 47(m) upon which the *Montoya* division relied had since been eliminated; and (4) how, consequently, there was no longer a bar to sending depositions (or other testimonial exhibits) into the jury room with the jury in criminal cases.

After defendant filed his notice of appeal in this court, the supreme court decided *Frasco v. People*, 165 P.3d 701 (Colo.2007). Although *Frasco* had not been announced when the trial court ruled in this case, we apply it here because this case was pending on direct appeal when *Frasco* was issued. *See Lopez v. People*, 113 P.3d 713, 716 (Colo.2005).

*Frasco* was a sexual assault on a child case. The trial court admitted, over the defendant's objection, a videotape of the vic-

tim's pretrial statement to law enforcement officers. Before playing the videotape in court, the court instructed the jurors not to give the tape more significance than other evidence, and instructed the jurors at the end of the trial that they would have to request permission to see the tape again. The jury made such a request, to which the defendant acceded, and the jury was allowed to review the tape during its deliberations. 165 P.3d at 702.

*Frasco* concluded that the reliance on the change in the language of C.R.C.P. 47(m) in the *McKinney–Isom* line of cases was misplaced. Rather, the supreme court held that the proper analysis stemmed from decisions in two criminal cases, *Settle v. People*, 180 Colo. 262, 264, 504 P.2d 680, 680–81 (1972), and *Wilson v. People*, 103 Colo. 150, 157–65, 84 P.2d 463, 466–70 (1938). Those cases established several relevant principles: (1) trial courts have discretion to allow a deliberating jury access to evidence admitted during trial; (2) there is no blanket rule excluding "testimonial evidence," such as depositions, from the scope of the court's discretion; (3) courts should be aware, when exercising this discretion, that jury access to testimonial evidence can present a risk of undue weight or emphasis being given to the evidence; and (4) courts should ensure that juries are not allowed to use exhibits in a way that unfairly prejudices defendants or the prosecution. Thus,

> the trial court's ultimate objective must be to assess whether the exhibit will aid the jury in its proper consideration of the case, and even if so, whether a party will nevertheless be unfairly prejudiced by the jury's use of it.

*Frasco*, 165 P.3d at 704–05.

The supreme court determined that the trial court had not abused its discretion because the record was unclear whether the defendant objected to the jury's request to review the tape; the court instructed the jury when the videotape was admitted that it had no more significance than any other evidence; the court required the jury to request the videotape before allowing the jury to view it; and the court consulted with counsel

before making its decision. Important for our review here, the supreme court observed:

> The child testified at trial about the defendant's various acts of sexual abuse, sometimes with more and sometimes with less detail than in the earlier interview, and she was subjected to cross-examination about the differences or inconsistencies in the two accounts. In closing arguments, defense counsel drew the jury's attention to inconsistencies in the two accounts as support for his contention that the assaults were fabricated, and he specifically asked the jury, if it went through the videotape during deliberations, to take note of the suggestiveness of the questioning in that interview.
>
> Beyond asserting that the jury had an opportunity to view the exhibit repeatedly and give it undue weight, the defendant has alleged nothing about the particulars of the videotape that would likely render its review during deliberations unfairly prejudicial.

*Id.* at 705.

We conclude that this case is like *Frasco* in important respects. Although clearly there are differences from *Frasco,* we hold, for the reasons we explain below, that they are not sufficiently compelling to support a conclusion that the trial court abused its discretion by allowing the jury to have unsupervised access to the videotape.

### A. Nature of the Charges

This case, like *Frasco,* involved allegations of sexual assault on a child. Therefore, there is nothing inherently prejudicial in the nature of the charges here that was not considered in *Frasco.*

### B. Victim's Testimony

■ As in *Frasco,* the victim here testified, and was subject to cross-examination. His trial testimony was marked by repeated statements that he did not know the answers to questions about details of the sexual assault. This lack of detail was significantly different from the statements he made during the videotaped interview. This difference prompted the trial court to observe that it would admit the second videotape as evi-

dence of a prior inconsistent statement because the second interview was not cumulative of D.W.'s trial testimony: "[T]here are significant gaps and omissions from [D.W.'s] testimony . . . versus the contents of the [second videotape]." Thus, the reason for allowing the jury to have access to the videotape here was substantially similar to the reason for allowing the jury in *Frasco* to have such access.

### C. Defendant's Closing Argument

Defense counsel devoted a significant amount of her summation to inconsistencies between D.W.'s video interviews and his trial testimony. One major theme of her closing argument was presented near its beginning:

> Inconsistencies. There are a number of inconsistencies in [D.W.'s] statements. You've had an opportunity to observe his videotaped interviews.... You've been able to see differences in the stories and how these stories evolved over time. Everyone observed [D.W.] here in the courtroom and I would submit to you many, many times over and over again of saying I don't remember, I don't know, I don't recall. Those are inconsistencies with statements that he has made previously.

D.W.'s credibility was repeatedly questioned during defense counsel's closing argument. D.W.'s body language during one of the videotaped statements was addressed, and defense counsel concluded her remarks by stating, "[T]here are so many reasons in this case for you to doubt the story of [D.W.]." Thus, as in *Frasco,* defendant drew the jury's attention to inconsistencies among D.W.'s statements as part of his argument that D.W. invented the allegations.

### D. Instructions

The trial court did not instruct the jury that the videotapes had no more significance than any other evidence. However, the court gave the jury two instructions pertinent to the videotapes, which defendant approved. The first stated:

> In this case you heard out-of-court statements of [D.W.], which were admitted into evidence.

You are instructed that it is for you to determine the weight and credit to be given these statements. In making this determination you shall consider the age and maturity of the child, the nature of the statements, the circumstances under which the statements were made, and any other relevant factor.

The second stated:

Where a witness in a criminal trial has made a previous statement inconsistent with his testimony at trial, the previous inconsistent statement may be shown by any otherwise competent evidence and is admissible not only for the purpose of impeaching the testimony of the witness, but also for the purpose of establishing a fact to which his testimony and inconsistent statement relate.

When combined with the standard credibility-of-witnesses instruction, which the jury also received, these instructions placed the issue of D.W.'s credibility directly before the jury. They properly placed the weight to be given to D.W.'s testimony, and to the statements in the videotapes, in the jurors' hands. *See People v. Sprouse*, 983 P.2d 771, 778 (Colo.1999)(the determination of the credibility of witnesses is solely within the jury's province, and a court may not determine the weight to be accorded to various pieces of evidence). They alerted the jury to the universe of factors it could consider in evaluating the credibility of D.W.'s statements in the videotapes. *See* § 13–25–129(2), C.R.S.2008 (mandatory instruction indicating that jury must consider certain factors when evaluating a statement admitted under § 13–25–129(1), C.R.S.2008).

Further, defendant did not ask the court to instruct the jury that the videotape should not be given more emphasis than other evidence. The absence of such a request weighs against defendant's claim of prejudice, and brings this issue closer to the facts of *Frasco*. *See* 165 P.3d at 705 (counsel did not request "a limiting procedure or instruction").

### E. Objection to Jury Access

Unlike in *Frasco*, defendant here specifically objected to the jury's being given the videotapes during its deliberations on the basis that, as testimonial evidence, (1) the jury could give more weight to the contents of the videotapes; and (2) the jury would be able to review the tapes as many times as it wished, which would not be possible for "any of the other testimony that was presented at trial."

However, aside from this general objection, defense counsel did not provide any particulars about the videotape that would result in unfair prejudice to defendant. Indeed, defendant's only objection to the original admission of the videotape in evidence at trial was that it would bolster D.W.'s trial testimony; and his objection to allowing the jury to have access to the videotape merely added that the jury might give more weight to it. Thus, as in *Frasco*, defendant here did nothing beyond arguing that allowing the jury access to the videotape might allow the jury to give it undue weight.

### F. Controlled Access

Unlike in *Frasco*, the trial court here did not require the jury to ask to see the videotape before providing it. We recognize that there is strong support for the proposition that it may be better practice to require the jury to ask to see videotapes and then for the court to supervise the viewing of them. *See id.* at 705 n. 5 (quoting Unif. R.Crim. P. 533); *id.* at 706–07 (Martinez, J., specially concurring). However, based upon the foregoing analysis of the other factors discussed in *Frasco*, we cannot conclude that the trial court's decision not to control access to the videotape in this case amounted, by itself, to an abuse of discretion.

### G. Use of Videotape

Further, unlike in *Frasco*, the jury here did not ask to have the videotape sent to the jury room. Although we know the videotape was in the jury room, we have no indication that the jury replayed the videotape during its deliberations, or that the jury was even interested in the videotape's contents.

We conclude there is no greater likelihood of unfair prejudice here than in *Frasco*. Indeed, whether the jury in this case replayed

the videotape is speculation. Therefore, the prospect of unfair prejudice may be *less* here than in *Frasco* because the record contains no indication that the jury wanted the videotape replayed or, in fact, replayed it.

## H. Nature of Videotapes in General

In reaching our conclusion, we recognize that courts in Colorado and in other states have expressed a legitimate concern that videotaped statements, by their very nature, may unfairly prejudice jurors. *E.g., People v. Newbrough*, 803 P.2d 155, 161 (Colo.1990) ("A videotaped interview of a child victim is undoubtedly more powerful, and thus potentially more prejudicial, than testimony of a witness about what the child said."), *superseded by statute*, § 18–3–413(5), C.R.S.2008, *as stated in People v. Carter*, 919 P.2d 862, 864 (Colo.App.1996); *State v. Burr*, 195 N.J. 119, 948 A.2d 627, 635 (2008); *State v. Koontz*, 145 Wash.2d 650, 41 P.3d 475, 478 (2002)(discussing videotaped trial testimony). Indeed, *Frasco* recognized that "some kinds of exhibits obviously have a greater potential for unfair prejudice than others." 165 P.3d at 705.

■ However, *Frasco* also makes clear that allowing a jury unsupervised access to a videotape is not, per se, an abuse of discretion. Rather, a trial court must be sensitive to the specific circumstances before it when deciding whether to allow a jury access to a videotape during deliberations. *Id.* at 704.

For example, videotapes of a child's pretrial statement to a third person may "possess unique strengths and weaknesses and are distinct evidence from the child victim's trial testimony." *State v. Parker*, 208 S.W.3d 331, 337–39 (Mo.Ct.App.2006)(quoting *State v. Skipper*, 101 S.W.3d 350, 353 (Mo.Ct.App. 2003)). Such videotapes may be viewed by juries in Missouri during deliberations as long as they are not duplicative of the child's trial testimony, and the court prevents the jury from giving the videotapes undue repetition by controlling its access to the videotapes. *Id.* at 339.

Or, there may be comparatively little risk that a jury will misuse or place undue weight on audiotaped or videotaped statements if

they were previously admitted as exhibits. *See Harris v. State*, 659 N.E.2d 522, 526–27 (Ind.1995)(audiotape of the defendant's confession); *Jackson v. Commonwealth*, 267 Va. 178, 590 S.E.2d 520, 533 (2004) (videotape of the defendant's confession; "That jurors may put emphasis on certain evidence, perhaps a particular exhibit or testimony of a certain witness, is simply part of what they do when weighing and considering the evidence.").

## I. Conclusion

Like the statements described in *Parker*, the videotape here had strengths and weaknesses that were distinct from D.W.'s testimony, which the trial court recognized when it decided to admit the videotape under section 16–10–201. The videotape included significant detail about which D.W. did not testify at trial. Further, when determining whether the videotape was admissible at the pretrial hearing, the trial court applied the analysis required by section 13–25–129, which requires a finding that there were sufficient safeguards indicating that the statements in the videotape were reliable. § 13–25–129(1)(a).

Thus, because of the extensive impeachment to which D.W. was subjected, and because the inconsistencies between D.W.'s testimony and the videotape statements were emphasized in defendant's closing argument, we conclude that the videotape aided the jury in its "proper consideration of the case." *Frasco*, 165 P.3d at 704–05.

We conclude that defendant was not unfairly prejudiced by the trial court's decision to allow the jury unsupervised access to the videotape because:

- the videotape was admitted as an exhibit and played for the jury in open court during the trial, thus reducing the likelihood that the jury would place *undue* weight on it;

- significant inculpatory evidence was introduced at trial in addition to the videotape, including D.W.'s testimony; statements about the abuse made by D.W. to a therapist treating him for depression and suicidal ideation before the videotape was recorded; an admission defendant made when confronted about the sexual

abuse by D.W.'s mother; and an admission defendant made to an acquaintance; and

• the jury was allowed to take notes, which would allow for (1) preservation of at least some trial testimony in note form; and (2) the prospect that the jury would place greater emphasis on such preserved trial testimony during its deliberations.

Therefore, applying the principles discussed in *Frasco*, we conclude that the trial court's decision to allow the jury to have unsupervised access to the videotape in this case was not an abuse of discretion because the videotape aided the jury in its proper deliberation of the case without subjecting defendant to unfair prejudice.

## II. Postconviction Motion

In his motion for postconviction relief, defendant asserted that ineffective assistance of counsel deprived him of a fair opportunity to take advantage of either of two plea offers. In one instance, he alleged that the plea offer had never been communicated to him; in the other, that counsel had not adequately discussed the plea offer with him.

On appeal of the trial court's order denying his motion for postconviction relief, defendant contends that (1) the judge who conducted the postconviction proceedings should have disqualified himself; (2) the court erroneously excluded the testimony of a defense investigator; and (3) the court should have concluded that he was denied the effective assistance of counsel with respect to both plea offers. We disagree with each of these three contentions.

### A. Disqualification of Judge

■ The judge who heard defendant's postconviction motion was not the same judge who presided over his trial. He was a former deputy district attorney in the office that was prosecuting defendant in this case. The judge had worked in the office when defendant's case was investigated and tried, and, as relevant here, when plea negotiations were conducted.

Based on these facts, defendant filed a motion to disqualify the judge. Defendant asserted that disqualification was required because the judge was employed by the district attorney's office while it was prosecuting this case and knew the attorneys prosecuting the case. The judge denied the motion.

■ Determining whether a judge's disqualification is necessary requires a case-by-case inquiry. *Schupper v. People,* 157 P.3d 516, 521 (Colo.2007). In ruling on a disqualification motion, a judge must accept as true the facts stated in the motion and accompanying affidavits and then determine as a matter of law whether they allege legally sufficient facts for disqualification. *People v. Julien,* 47 P.3d 1194, 1197 (Colo.2002).

We review de novo the judge's disqualification ruling. *Id.*

■ A judge must be free of all taint of bias and partiality. *People v. Dist. Court,* 192 Colo. 503, 506, 560 P.2d 828, 831 (1977). To this end, under the Colorado Code of Judicial Conduct, a judge should disqualify himself or herself whenever the judge's impartiality might reasonably be questioned. C.J.C. 3(C)(1). This rule encompasses not only instances where the judge has an actual bias or prejudice, but also those where the judge has an apparent bias. *See Wilkerson v. Dist. Court,* 925 P.2d 1373, 1376 (Colo. 1996); *see also In re Estate of Elliott,* 993 P.2d 474, 481 (Colo.2000) ("If an appearance of partiality exists, it is incumbent upon a judge to disqualify herself from the proceedings.").

■ Neither bias, nor an appearance of bias, exists solely because a judge was formerly employed by the district attorney's office that is currently prosecuting the defendant. There must exist some factual basis tying the judge to personal knowledge of disputed evidentiary facts, showing that the judge had some role in investigating and prosecuting the case, or indicating that the judge had some supervisory role over the attorneys prosecuting the case. *Julien,* 47 P.3d at 1198.

■ Further, the mere existence of a friendship with former colleagues in a district attorney's office does not require disqualification. *Schupper*, 157 P.3d at 520. To require disqualification, the friendship must be "so close or unusual that a question of partiality might reasonably be raised." *Id.; see also People v. Crumb*, 203 P.3d 587, 593 (Colo. App.2008)(not every connection between a judge and a participant in a case will require recusal); *United States v. Murphy*, 768 F.2d 1518, 1538 (7th Cir.1985) (disqualification required where objective observer might wonder whether the judge could decide the case with the requisite aloofness and disinterest).

Here, accepting the facts alleged by defendant as true, we note defendant did not allege that the judge (1) had personal knowledge of the case; (2) played a role in investigating or prosecuting the case; (3) supervised any of the prosecuting attorneys; or (4) maintained anything more than a "professional" friendship with those attorneys.

Under the standards set forth in *Julien* and *Schupper*, we conclude, as a matter of law, that the facts alleged in this case were insufficient to require the judge's disqualification.

In reaching this conclusion, we necessarily reject defendant's assertion that this case should be decided differently from *Julien* or *Schupper* because, unlike simply refereeing the parties' conduct at trial, the judge here was put in the position of having to weigh the credibility of, or the evidence presented by, his former colleagues, one of whom had been the judge's supervisor.

■ We agree with defendant that, in a postconviction motion, it is the trial court who determines the credibility of witnesses and the weight to be given their testimony. *People v. Sickich*, 935 P.2d 70, 73 (Colo.App. 1996). But defendant does not cite any authority, nor can we find any, that supports his proposition that the standards for disqualification are more stringent when the judge acts as a fact finder, as opposed to a "referee," at trial.

We reject defendant's suggestion that we carve out differing categories of bias based upon the role of the judge in the proceeding.

Even acting in the capacity of a presiding "referee" at trial, a judge would still operate as a fact finder with respect to various motions put before him or her, and make other important rulings, such as those involving the evaluation of the admissibility of evidence. And there is no reason to presume that a judge's mere acquaintance, or past association with, attorneys appearing before him or her would render the judge biased with respect to either the law or the facts.

Moreover, we note that prosecutorial credibility was not at issue in the postconviction proceedings. At issue there was the conduct of defense counsel, not the prosecutors. Because the judge was not, therefore, put in the position of having to evaluate the credibility of his former colleagues, or the propriety of their acts, there was no need for the judge to disqualify himself even under defendant's theory.

### B. Exclusion of Investigator's Proffered Testimony

■ Defendant has a form of autism. One of the main claims he asserted as a basis for postconviction relief was that his lawyer had not taken sufficient care to ensure that he understood a particular plea offer and the consequences of his accepting or rejecting that offer.

At the hearing, defendant called a private investigator and, on direct examination, asked him about his "experience representing clients with mental limitations when a plea bargain is extended." The People objected, and the trial court sustained the objection on the grounds that (1) the investigator could not testify as a lay observer because he was not present when the particular plea offer was discussed; and (2) the investigator was not qualified to testify as an expert regarding the standard of practice lawyers should observe in communicating with a client who is mentally impaired.

■ We review a trial court's evidentiary ruling for an abuse of discretion. *People v. Stewart*, 55 P.3d 107, 122 (Colo.2002); *see also People v. Laurent*, 194 P.3d 1053, 1058 (Colo.App.2008) (decision to admit expert tes-

timony reviewed for abuse of discretion); *People v. Veren,* 140 P.3d 131, 136 (Colo.App. 2005) (decision to admit lay testimony reviewed for abuse of discretion).

██ A trial court abuses its discretion when it bases its ruling on an erroneous view of the law or when its decision is manifestly arbitrary, unreasonable, or unfair. *See People v. Garcia,* 169 P.3d 223, 226 (Colo.App. 2007).

Here, whether the trial court abused its discretion turns on whether the investigator's testimony would have been admissible under either CRE 701 or 702.

We perceive no abuse of discretion in the court's ruling under CRE 701 because the investigator's testimony would not have been rationally based on his perceptions (he was not present when defendant decided to reject the plea deal) and would have required the specialized knowledge of an attorney. *See* CRE 602 (witness may not testify as to matters of which he or she does not have personal knowledge); *Veren,* 140 P.3d at 137 (a person may testify as a lay witness only if his or her opinions do not require any specialized knowledge); *People v. Hoskay,* 87 P.3d 194, 197 (Colo.App.2003) (lay witness may state a lay opinion if witness had sufficient opportunity to observe subject matter of opinion).

We also perceive no abuse of discretion in the court's ruling under CRE 702 because the investigator was not shown to be qualified by education, training, or experience regarding the standard of practice required of an attorney in communicating plea offers to mentally impaired clients. *See* CRE 702 (to testify as expert, witness must be qualified as an expert by knowledge, skill, experience, training, or education); *People v. Rojas,* 181 P.3d 1216, 1220 (Colo.App.2008) (before a witness may render opinion as an expert, trial court must ensure that witness is qualified to opine on the matter).

### C. Court's Ruling on Defendant's Claim of Ineffective Counsel

We are also not persuaded by defendant's argument that the court's ruling on his ineffective assistance claim must be reversed and the case remanded for further proceedings.

At issue here were two plea offers, sent to two different defense counsel at the same firm. The prosecution mailed its first plea offer to the first counsel. However, by the time the prosecutor made that offer, that attorney had left the firm. Defendant's second counsel became aware of that offer shortly before a court appearance and, upon speaking to the prosecutor, learned that the offer had been withdrawn and that a more favorable one would be forthcoming. After the prosecutor made the second offer, counsel communicated it to defendant and his parents via a fifteen-minute telephone conference. Defendant did not accept the plea offer and took his case to trial.

On appeal, defendant contends (1) that the trial court erred in not finding that his attorneys' conduct in either not communicating or inadequately communicating the offers fell below a reasonable standard of care and (2) that a remand is necessary for appropriate findings as to the prejudice defendant suffered as a result of his attorneys' deficiencies. We disagree.

██ In a Crim. P. 35(c) proceeding, the legality of the judgment is presumed and the burden is on the defendant to establish by a preponderance of the evidence the allegations in his or her motion. *People v. Simpson,* 69 P.3d 79, 80 (Colo.2003). On appeal, the weight and credibility to be given to the testimony of witnesses are within the province of the trial court; therefore, if the record reveals sufficient evidence to support the court's findings, we will not disturb them on review. *Kailey v. Colo. State Dep't of Corr.,* 807 P.2d 563, 567 (Colo.1991); *People v. Starkweather,* 159 P.3d 665, 668 (Colo.App. 2006).

To prevail on a claim of ineffective assistance of counsel, a defendant must establish that (1) counsel's performance fell below the level of reasonably competent assistance demanded of attorneys in criminal cases and (2) the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *People v. Gandiaga,* 70 P.3d 523, 525 (Colo.App.2002). When evaluating an ineffective assistance of counsel claim based on

an omission in advising a client, the trial court must judge the reasonableness of the attorney's conduct on the basis of all the factual circumstances of the particular case, viewed in light of the prevailing standards of minimally acceptable professional conduct. *People v. Williams*, 908 P.2d 1157, 1160–61 (Colo.App.1995).

In the first prong of the *Strickland* test, the defendant must overcome the presumption that, under the circumstances, the attorney's conduct fell within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *Carmichael v. People*, 206 P.3d 800, 806 (Colo.2009) (a defendant has a right to make a "reasonably informed decision whether to accept a plea offer" (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir.1992)) ); *People v. Garcia*, 815 P.2d 937, 943 (Colo.1991); *Gandiaga*, 70 P.3d at 525.

To establish prejudice under the second prong of the *Strickland* test, the defendant must demonstrate a reasonable probability that, but for the attorney's unprofessional errors, the result of the proceeding would have been different—here, essentially, that defendant would have accepted the offer. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *Carmichael*, 206 P.3d at 806; *Garcia*, 815 P.2d at 943; *Gandiaga*, 70 P.3d at 525.

To obtain relief, the defendant must prove, by a preponderance of the evidence, each prong of the *Strickland* test. *People v. Russell*, 36 P.3d 92, 95 (Colo.App.2001). "If a court determines that counsel's performance was not constitutionally deficient, it need not consider the prejudice prong of the ineffective assistance of counsel test. Similarly, if a court determines that a defendant failed to affirmatively demonstrate prejudice, it may resolve the claim on that basis alone." *Gandiaga*, 70 P.3d at 526 (citations omitted).

Here, the court determined that second counsel's failure to convey the first plea offer did not fall below the standard of practice expected of lawyers and that, "in any event, no prejudice did, or could have, accrued to defendant as the result of the failure to communicate this offer." With respect to the second plea offer, the court found that "a reasonable attorney . . . would have believed

that defendant had understood what he had been told about the proposed agreement, and the consequences of rejecting it," and that, consequently, second counsel's acts and omissions "were not outside the wide range of professionally competent assistance expected of lawyers."

We address the court's rulings with respect to each of the plea offers, in turn.

### 1. First Offer

■■ Ordinarily, defense counsel's failure to convey a plea offer to a defendant constitutes per se deficient performance, even though the defendant otherwise received a fair trial. *People v. Perry*, 68 P.3d 472, 477 (Colo.App.2002).

When the second attorney became aware of the offer, the prosecutor notified her that it had been withdrawn and that (because the complaining witness had been arrested) a more favorable offer would be forthcoming. In our view, it was eminently reasonable for second counsel not to convey an offer that had already been withdrawn.

Even if, as defendant argues, the firm which employed both counsel should have timely informed him about the first offer, he was not prejudiced because, as we determine below, a more favorable offer was made and, after adequate consultation with counsel, defendant rejected it.

### 2. Second Offer

■ The second plea offer required defendant to plead guilty to two felony offenses, as opposed to the three felonies defendant would have been required to plead to under the first offer. The second offer carried lesser penalties than the first offer, and penalties that were substantially less severe than those defendant faced if convicted at trial.

At the hearing, defendant did not testify. His parents and second counsel presented conflicting accounts as to what was said and done when counsel conveyed the second plea offer to defendant. Defendant also presented the testimony of two experts, one of whom testified that it would take "substantially longer" than a short telephone call to effec-

tively communicate a plea offer to a mentally impaired individual, and the other of whom testified that counsel would have needed to subject defendant to a lengthy psychological examination process before knowing whether he could understand what was being communicated to him.

The trial court noted that, while it placed weight on the first expert's opinion, it did not believe that "any kind of 'bright line' rule can be established which sets the minimum time necessary to explain a proposed plea agreement to a criminal defendant." With respect to the second expert, the court was

> troubled ... by the suggestion that [effective assistance of counsel] requires attorneys to ensure that their clients have a "deep and meaningful" understanding of all aspects of their case. The court believes that ... a practice standard would be created which could not be met [if such a view were adopted]. Such a rule would open the floodgates to ineffective assistance claims based on a convicted defendant's shallow understanding of the proceedings against him.

Ultimately, the court concluded that second counsel's performance was not deficient because, under the circumstances, a reasonable attorney "would have believed [defendant] understood what he had been told."

We reject defendant's assertion that the court applied an incorrect legal standard here. The record evidences that the court was aware of and applied the correct legal standard. It quoted the part of *Williams* describing the test as involving "minimal standards of professional conduct," 908 P.2d at 1160–61, and, in finding that counsel's action was reasonable, concluded, at least implicitly, that counsel had met those minimal standards.

Defendant asserts that the trial court's finding is not supported by the evidence, inasmuch as the only evidence offered as to those minimal standards was provided by the defense experts, who testified second counsel had not met them.

Defendant's assertion ignores the dual role of the trial court in evaluating an ineffective assistance of counsel claim.

First, in postconviction proceedings, a trial court must determine the credibility of witnesses and the weight to be given their testimony. *Sickich*, 935 P.2d at 73. Here, in its order denying defendant's motion, the trial court made specific findings that it believed counsel's testimony and that, while the court placed "weight on the testimony of [one of the experts]," it was not persuaded by his opinion.

Second, the trial court must judge the reasonableness of the attorney's conduct on the basis of all of the factual circumstances of the case, viewed in light of the prevailing standards of minimally acceptable professional conduct. *Williams*, 908 P.2d at 1160–61.

To that end, the trial court made extensive and detailed findings of fact, specifically (1) that when second counsel first took over the case, she met with defendant and his family for two to three hours; (2) that, at this meeting, counsel explained to defendant that the charges carried the possibility of life in prison and were "very serious," and she confirmed that previous counsel had explained the charges and factual allegations against him; (3) that, once she received the second offer, second counsel discussed the offer with defendant and his parents in a ten- to fifteen-minute telephone conversation and immediately memorialized the discussion in a document; (4) that she explained the consequences of the offer (including sentence duration and unavailability of probation), and told defendant that he would be required to register as a sex offender; (5) that counsel discussed the risk of going to trial and the possibility that, if convicted, defendant could be sentenced to jail for the rest of his life; and (6) that defendant was aware of the consequences of going to trial because counsel told him directly, "You'll go to prison for the rest of your life if you're convicted of these charges."

From these facts, the court concluded that second counsel was aware that defendant suffered from a mental impairment and took appropriate steps to deal with it by requiring defendant's parents to be present for all conversations with defendant, and given her knowledge of and interaction with defendant, it would be unreasonable for the attorney to

think defendant would not have understood her when she discussed the plea offer with him. The trial court found that the attorney's actions were not outside the wide range of professionally competent assistance expected of lawyers who appear before the court.

This case is substantially different from the one our supreme court recently examined in *Carmichael*. There, the parties agreed that defense counsel's representation was deficient, and the supreme court concluded that the deficiency was "particularly aggravated" because defense counsel did not understand "the potential consequences of the charges" against his client. *Id.* at 806. Here, the parties did not stipulate that the second attorney's conduct was deficient, and, from our review of the record, we conclude that the second attorney did not "fail[ ] to present defendant with the opportunity to make [a] reasonably informed decision" about the proposed plea disposition. *See id.* at 806.

In our view, the evidence is sufficient to support the trial court's factual determinations, and the trial court applied the proper legal standards and correctly concluded that defendant was not deprived of the effective assistance of counsel with respect to the second plea.

In light of the manner in which we have resolved this issue, we need not address defendant's contention regarding the necessity of a remand to properly gauge the prejudicial effect of counsel's action.

The judgments of conviction and the order denying postconviction relief are affirmed.

Judge J. JONES concurs.

Judge DAILEY dissents.

Judge DAILEY dissenting.

I respectfully dissent from part I of the majority's opinion.

In *Frasco v. People*, 165 P.3d 701 (Colo. 2007), the supreme court directed trial courts to ensure that testimonial exhibits [1] not be so selected or used in such a manner as to create a "likelihood of . . . being given undue

weight or emphasis by the jury." *Id.* at 703 (quoting *Settle v. People*, 180 Colo. 262, 264, 504 P.2d 680, 680–81 (1972)).

The supreme court's concern, in this regard, echoes (though does not quite mirror) the rule in many other jurisdictions barring the jury's unrestricted and unsupervised review of testimonial exhibits. *See generally* 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.9(c), at 515 (3d ed. 2007) ("In most jurisdictions, the trial judge has discretion to allow the jurors to take with them other materials, such as pertinent exhibits, which have been received in evidence. Where that practice is followed, an exception ordinarily is made for depositions that have been read into the record, as they are simply another form of testimony and should not be given any greater attention than other testimony." (footnote omitted) ); *see also, e.g., Fuller v. United States*, 873 A.2d 1108, 1116 (D.C. 2005) ("[M]ost [courts] consider that it is within the discretion of the judge to allow 'many types of tangible exhibits [and] written exhibits generally *except for those that are testimonial in nature.* . . .'" (quoting 2 *McCormick on Evidence* § 217, at 30 (John William Strong, ed., 5th ed.1999) ) (emphasis added) ); *Wright v. Premier Elkhorn Coal Co.*, 16 S.W.3d 570, 572 (Ky.Ct.App.1999) ("In general, testimonial evidence (such as a copy of a deposition) is not allowed in a jury room."); *State v. Williams*, 247 S.W.3d 144, 155 (Mo.Ct.App.2008) ("The broad 'general rule is that exhibits that are testimonial in nature cannot be given to the jury during its deliberation.'" (quoting *State v. Parker*, 208 S.W.3d 331, 338 (Mo.Ct.App.2006)) ); *State v. Dixon*, 259 Neb. 976, 614 N.W.2d 288, 296 (2000) ("The traditional common-law rule is that a trial court has 'no discretion to submit depositions and other testimonial materials to the jury room for *unsupervised review,* even if properly admitted into evidence at trial.'" (quoting *Chambers v. State*, 726 P.2d 1269, 1275 (Wyo.1986)) ); *State v. Burr*, 195 N.J. 119, 948 A.2d 627, 636 (2008) ("[A]ny playback of the videotape must occur in open court, along with the readback of related testimony that the court shall require."); *State v. Monroe*, 107 Wash.App. 637, 27 P.3d

---

1. Testimonial exhibits are transcripts of testimony or exhibits substituting for trial testimony.

1249, 1251 (2001) ("Traditionally under common law, the trial court had no discretion to submit depositions and other testimonial materials to the jury room for unsupervised review by the jury even if those materials had been properly admitted into evidence at trial.").

"Quite sensibly, courts have had some reluctance to permit the jury to take with it documents of a testimonial character, lest they 'act as a speaking, continuous witness ... to the exclusion of the totality of the evidence taken at the trial which must be viewed in its entirety.'" *Pino v. State*, 849 P.2d 716, 719 (Wyo.1993) (quoting 3 David W. Louisell & Christopher B. Mueller, *Federal Evidence* § 390, at 683–84 (1979 & Supp.1992)); *see* 1 Michael H. Graham, *Handbook of Federal Evidence* § 403:2 ("The fear ... is that [documents of testimonial character] present an unfair advantage to the proponent in having only this single segment of the entire trial testimony before the jury during deliberations."); *see also Burkhart v. Commonwealth*, 125 S.W.3d 848, 850 (Ky.2003) ("With [testimonial] exhibits, there is concern that jurors may accord great weight to testimony re-examined during deliberations, as compared to the 'live' evidence heard at trial, because the unreviewed testimony 'can only be conjured up by memory.'" (quoting *Wright*, 16 S.W.3d at 572)); *Monroe*, 27 P.3d at 1251 ("The purpose of [the rule barring unsupervised jury review of testimonial materials] was to prevent juries from overemphasizing the submitted testimony to the detriment of the testimony that was not submitted.").

When, as here, a videotaped interview of a child is introduced to prove sexual abuse, the videotape is self-serving to the extent that it is testimonial in nature and asserts the truth of the child's statements. *Young v. State*, 645 So.2d 965, 967 (Fla.1994); *see Mathews v. State*, 258 Ga.App. 29, 572 S.E.2d 719, 721 (2002) (testimonial exhibits (including videotapes) "contain their makers' assertion of purported truths [and] are ascribed evidentiary value only to the extent that their makers are credible" (quoting *Sagenich v. State*, 255 Ga.App. 663, 566 S.E.2d 327, 328 (2002))); *Burr*, 948 A.2d at 635 ("The video-

taped pretrial statement at issue in this appeal is, however, significantly different from a demonstrative exhibit. Although it is evidence, it is also testimony. It is, in effect, a hybrid of the two. Unlike a demonstrative exhibit, the videotape contains hearsay statements offered for the truth of the matter asserted.").

Many states recognize that "the nature of videotaped testimony increases the likelihood it will be given undue emphasis when replayed" during jury deliberations. *See State v. Koontz*, 145 Wash.2d 650, 41 P.3d 475, 479 (2002).

> In essence, the witness is brought before the jury a second time, after completion of the defense case, to repeat exactly what was testified to in the State's case. The witness' words and all of the animation, passion, or sympathy originally conveyed are again presented to the jury. It is difficult to deny that there is an advantage that may be gained in such circumstances.

*State v. Michaels*, 264 N.J.Super. 579, 625 A.2d 489, 524 (App.Div.1993), aff'd, 136 N.J. 299, 642 A.2d 1372 (1994), *and quoted with approval in Burr*, 948 A.2d at 635–36 (recognizing that "allowing a jury unfettered access to videotaped witness statements could have much the same prejudicial effect as allowing a jury unrestricted access to videotaped testimony during deliberations"); *see United States v. Binder*, 769 F.2d 595, 600 (9th Cir.1985) ("Videotape testimony is unique. It enables the jury to observe the demeanor and to hear the testimony of the witness. It serves as the functional equivalent of a live witness [with the jury in the room]."), *overruled on other grounds by United States v. Morales*, 108 F.3d 1031, 1035 n. 1 (9th Cir. 1997) (en banc); *Young*, 645 So.2d at 967 ("By permitting the jurors to see the interview once again in the jury room, there is a real danger that the child's statements will be unfairly given more emphasis than other testimony. Furthermore, unlike testimony in open court or even deposition testimony, the interviews are conducted on an ex parte basis without the right of cross-examination."); *Martin v. State*, 747 P.2d 316, 319 (Okla.Crim.App.1987) ("[T]here is an important distinction between having parts of testi-

mony dispassionately read to a jury and allowing the jury to hear, and see, the entire testimony of an empathetic witness, such as a child describing a painful experience in his young life. The possibility for abuse is, we believe, substantially increased with video technology. This being so, a trial judge should carefully consider the alternatives before placing the video in the unrestrained hands of the jury during deliberation. We believe that the risk of prejudice is great in this situation.").

In *Frasco,* the supreme court did not prohibit jury access to testimonial videotapes during deliberations. 165 P.3d at 704. Nor did it mandate time limitations on jury access to exhibits or particular limiting instructions concerning the use of exhibits during deliberations. *Id.* It simply obliged trial courts to "to assure that juries are not permitted to use exhibits in a manner that is unfairly prejudicial to a party." *Id.*

The supreme court held that, under the circumstances of that case, the trial court did not abuse its discretion in allowing jury access during deliberations to a videotaped statement of a child sexual assault victim. There, the trial court had "issued an instruction that the videotape not be given special weight, required the jury to make a request to see the evidence before allowing it into the jury room, and conferred with counsel before permitting it to be given to the jury." *Id.* at 706 (Martinez, J., specially concurring). Indeed, defense counsel "expressly represented to the court that he had no objection to [unimpeded jury] access" to the tape. *Id.* at 705.

Further, the supreme court noted,

Beyond asserting that the jury had an opportunity to view the exhibit repeatedly and give it undue weight, the defendant has alleged nothing [on appeal] about the particulars of the videotape that would likely render its review during deliberations unfairly prejudicial. In light of the prior inconsistent statements it contained

and the tactical use made of them by defense counsel at trial ... it is not even clear that defense counsel considered granting the jury access to the videotape to be disadvantageous.

*Id.* at 705.

Here, unlike in *Frasco,* the trial court did not (1) give a limiting instruction with respect to the victim's videotaped statement; (2) wait for a jury request to review the videotape; or (3) obtain counsel's agreement to allow the jury to have access to the tape. Indeed, with respect to the videotape of the second interview, the trial court here did not exercise any discretion to the end identified in *Frasco:* without even considering whether the jury might give undue weight to that videotape, the court allowed the jury access to it, without even so much as providing the jury with a cautionary or limiting instruction. *See United States v. Smith,* 419 F.3d 521, 527–29 (6th Cir.2005) (court erred in failing to give a proper cautionary instruction before providing the deliberating jury with a copy of witness's grand jury testimony).

The trial court, then, was not, as the majority here seems to think, "sensitive to the specific circumstances" of the case.[2] While the trial court's lack of concern for unfair prejudice was understandable in light of the precedent that existed at the time of trial, it nonetheless constituted an abuse of discretion, and, thus error, under *Frasco.* *See People v. Robinson,* 187 P.3d 1166, 1177 (Colo.App.2008) ("A trial court necessarily abuses its discretion where it misconstrues or misapplies the law."); *see also People v. Darlington,* 105 P.3d 230, 232 (Colo.2005) (the "failure to exercise discretion is itself an abuse of discretion").

Further, I think the court's error was prejudicial to defendant. As recounted above, in *Frasco,* the supreme court indicated that, to show prejudice, the defendant must go beyond merely asserting that the jury had an opportunity to repeatedly view the exhibit and give it undue weight. Rather, the defen-

---

**2.** The majority's reliance on *State v. Parker,* 208 S.W.3d 331, 339 (Mo.Ct.App.2006), as an example of how a court could be "sensitive to the specific circumstances," is illustrative. In *Parker,* the court did not allow the jury unrestricted and unsupervised access to a videotape during deliberations, but only allowed the jury to view the tape again in open court. That did not occur here.

dant must allege something about the particulars of the videotape that would render its unsupervised review during deliberations unfairly prejudicial because of the likelihood that the jury would give it undue weight or emphasis. *Frasco,* 165 P.3d at 705; *see Settle,* 180 Colo. at 264, 504 P.2d at 680 (reversal is warranted if there is a likelihood that the submitted evidence was used in such a manner that it was given undue weight or emphasis by the jury).

I am persuaded that defendant has made the requisite showing of prejudice in this case.

Pointing out that in the second videotaped interview the victim describes the alleged sexual assaults in much greater detail than he did during trial, defendant asserts that giving the jury unrestricted and unsupervised access to that videotape diluted the value of evidence impeaching the victim. This follows, he says, because the jury was allowed to repeatedly review what he characterizes as the prosecution's strongest evidence, but not any contradictory testimony. I agree.

From my review of the record, the victim, D.W., was vague and equivocal in his trial testimony. Although he described the basics of two sexual assaults, as well as two additional grooming incidents, he frequently responded to questions eliciting details of those events with "I don't know" or "I don't remember."

On the videotape, D.W. explains the same four instances, but in much greater detail. Specifically, D.W. provided greater detail (1) about the fellatio in the cemetery, including its duration, that this was only the "most recent time" it had occurred, and the physical changes that occurred to defendant's genitals during the fellatio; (2) about the sexual assault in the shower, including how defendant not only anally penetrated him, but forced him to penetrate defendant, how defendant moaned and cursed during the incident, how defendant took pictures of D.W.'s genitals, and how defendant ejaculated on him; (3) about a grooming incident that occurred on New Year's Eve, including that defendant told D.W. to pull down his pants so that defendant could photograph his genitals;

and (4) about another grooming incident, including how defendant picked him up, took him for a ride, and showed him nude pictures of a young teenage girl. In addition, the videotape shows a very introverted and emotionally wrecked D.W.

During trial, defendant elicited admissions from D.W. that were meant to attack his credibility and support the defense theory that D.W. had fabricated the incident. For example, D.W. admitted that he had lied (1) to his parents about seeing defendant in a bookstore (while a restraining order was in place); (2) to his parents when he said defendant had talked to him at the bookstore; (3) to a detective about the same incident; and (4) to the police when he called 911 to report that someone was throwing rocks at the window while his parents were not home. Defendant tried to establish, through specific examples, that D.W. would lie to avoid getting in trouble or being disciplined.

I cannot tell (nor, under CRE 606(b), could we inquire about) the extent to which the jury relied on the videotape of the second interview to the exclusion of evidence that impeached D.W.'s credibility. The majority asserts that because the jury did not specifically request the videotape, we can only speculate as to whether the jury actually reviewed the tape at all. However, courts have engaged in extensive analysis of the dangers attending unrestricted and unsupervised jury access to testimonial exhibits, regardless of whether the jury has requested to review the exhibit. *See Martin,* 747 P.2d at 319; *see also State v. Bales,* 297 Mont. 402, 994 P.2d 17, 21 (1999) (specifically noting that jury did not request the videotape, but analyzing the issue in-depth and resolving on a harmless error analysis); *see also Janson v. State,* 730 So.2d 734, 735 (Fla.Dist.Ct.App.1999) (where no indication that jury requested the material, analyzing the issue in-depth and resolving on harmless error grounds). In cases like this, we are called upon only to determine the *likelihood* that an exhibit was given undue weight or emphasis by the jury.

In this case, defendant did not testify, no other testimonial evidence was sent with the jury into deliberations, and the People heavi-

ly emphasized the videotape and its graphic details in their closing arguments. The jury would have had to rely upon its collective memory for the remainder of the testimony, including the evidence impeaching D.W.'s credibility; and, no cautionary or limiting instruction was given the jury with respect to the videotape.

The prosecution presented a strong, but not overwhelming, case of defendant's guilt.[3] Under these circumstances, I believe that there is a strong likelihood that the jury gave the videotape undue weight or emphasis during deliberations.

Unlike the majority, I am not persuaded that any concern for unfair prejudice was alleviated here simply because the videotape was first played for the jury in open court. Whether a jury will give undue weight to, or place undue emphasis on, a testimonial exhibit cannot be equated with whether the exhibit was admissible (or admitted) in the first place. It is the jury's ability to access (and particularly, to have unrestricted and unsupervised access to) an exhibit *after* it has been admitted and used before the jury in open court that creates the danger of its being given undue weight or emphasis, within the meaning of *Frasco* and *Settle*.

Nor am I persuaded that the danger of a jury's giving undue weight or emphasis to a testimonial exhibit during deliberations is, in reality, little different from the danger that the jury would place emphasis on trial testimony as preserved in the notes of individual jurors. Unlike a videotaped exhibit, juror notes are not evidence, are not superior to independent recollections of the jurors, and do not prevail over the evidence presented at trial.[4] In contrast, the videotaped exhibit is evidence; it is not subject to correction by an individual juror's recollection, and, is, as I explained earlier, the equivalent of allowing a

witness (not, as in the case of a juror, an impartial decision maker) into the jury room.

Further, a juror's note cannot replicate the animation, passion, or sympathy of the witness whose statements are captured on a videotaped exhibit.

Finally, I reject any suggestion that any error here was rendered harmless when defendant referred to the videotape during closing argument. From my review of the record, defendant made only a generic reference to inconsistencies between D.W.'s videotaped statements and his trial testimony. He did not otherwise mention, much less emphasize, the contents of the videotape. Defendant's attempt to simply neutralize the impact of the tape cannot, in my view, be characterized as having put it to an advantageous use.

Because I believe that a strong likelihood exists that the jury gave the videotape undue weight or emphasis, I believe reversible error occurred. *See Barnes v. State,* 970 So.2d 332, 339–41 (Fla.2007) (reversible error to submit to jury without cautionary instruction tape that was inculpatory, contained inconsistent statement on important issue, and was emphasized and referred to in closing argument as "critical" by the prosecution); *cf. Bales,* 994 P.2d at 22 (not reversible error to submit to jury tape that was merely cumulative of trial testimony and that defendant had not claimed was critical to state's case).

Consequently, I would reverse defendant's conviction and remand the case for a new trial.

---

**3.** To the extent that the majority suggests that the jury's access to the videotape during deliberations may not have had much significance, given defendant's admissions to two witnesses, I would note that: (1) in the first instance, defendant's statement, "I'm so sorry, I didn't mean it," as D.W.'s mother was chasing and hitting him, was not, under the circumstances, unambiguous in import; and (2) the evidence of defendant's other admission was subject to a significant attack on

its credibility, inasmuch as the witness who testified to such had numerous felony convictions and a history of working as a confidential informant.

**4.** *See United States v. Maclean,* 578 F.2d 64, 66 (3d Cir.1978); *People v. Hues,* 92 N.Y.2d 413, 681 N.Y.S.2d 779, 704 N.E.2d 546, 549–50 (1998).