Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
April 24, 2017

2017 CO 35

**No. 14SC588, <u>People v. Jefferson</u>—Testimonial Evidence—Electronic Exhibits—Jury Deliberations—Abuse of Discretion.**

This case concerns the scope of a trial court's discretion to permit, deny, or restrict the jury's access during deliberations to a DVD containing the recorded statement of a child sexual assault victim, which DVD was admitted as an exhibit in a criminal trial.

The supreme court concludes that the trial court did not employ the requisite caution to ensure that the DVD would not be used in such a manner as to create a likelihood that the jury would accord it undue weight or emphasis. Specifically, the trial court relied on the court of appeals division's analysis in <u>People v. DeBella</u>, 219 P.3d 390, 396–97 (Colo. App. 2009), <u>rev'd</u>, 233 P.3d 664 (Colo. 2010), but the supreme court reversed the decision in that case. By relying on an analysis that the supreme court later rejected, the trial court misapplied the law and abused its discretion. Moreover, because the nature of the DVD and its importance to the case's resolution leave the supreme court with grave doubts as to the effect that unfettered access had on the verdict and the fairness of the proceedings, the court cannot deem the error harmless.

Accordingly, the court affirms the judgment of the court of appeals.

**The Supreme Court of the State of Colorado**

2 East 14th Avenue • Denver, Colorado 80203

**2017 CO 35**

**Supreme Court Case No. 14SC588**

*Certiorari to the Colorado Court of Appeals*

Court of Appeals Case No. 11CA1465

**Petitioner:**

The People of the State of Colorado,

v.

**Respondent:**

Dherl Jefferson.

**Judgment Affirmed**

*en banc*

April 24, 2017

**Attorneys for Petitioner:**

Cynthia H. Coffman, Attorney General

Erin K. Grundy, Assistant Attorney General

*Denver, Colorado*


**Attorneys for Respondent:**

Douglas K. Wilson, Public Defender

Jud Lohnes, Deputy Public Defender

Anne Stockham, Deputy Public Defender

*Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.

**JUSTICE BOATRIGHT** dissents.

¶1     This case concerns the scope of a trial court's discretion to permit, deny, or restrict the jury's access during deliberations to a DVD containing the recorded statement of a child sexual assault victim, which DVD was admitted as an exhibit in a criminal trial.  The People challenge the decision of a unanimous division of the court of appeals, People v. Jefferson, 2014 COA 77M, ___ P.3d ___, which concluded that the trial court had abused its discretion in granting the jury unrestricted access to such an exhibit and that the error required reversal and a new trial.[1]  According to the People, the division misconstrued our precedent, including DeBella v. People, 233 P.3d 664 (Colo. 2010), and the trial court acted within the bounds of its discretion.

¶2     We are not persuaded.  Instead, we agree with the division that the trial court did not employ the requisite caution to ensure that the DVD would not be used in such a manner as to create a likelihood that the jury would accord it undue weight or emphasis.  Specifically, the trial court relied on the court of appeals division's analysis in People v. DeBella, 219 P.3d 390, 396–97 (Colo. App. 2009), rev'd, 233 P.3d 664 (Colo. 2010), but this court reversed the decision in that case.  By relying on an analysis that this court later rejected, the trial court thus misapplied the law and abused its discretion.  Moreover, because the nature of the DVD and its importance to the case's

---

[1] Specifically, we granted certiorari to review the following issue:

> Whether the court of appeals erroneously expanded the scope of DeBella v. People, 233 P.3d 664 (Colo. 2010), to require actual restrictions on a jury's access to testimonial electronic exhibits rather than a case-by-case analysis of whether restrictions are appropriate.

resolution leave us with grave doubts as to the effect that unfettered access had on the verdict and the fairness of the proceedings, we cannot deem the error harmless.

¶3    Accordingly, we affirm the judgment of the court of appeals and remand the case to that court for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶4    In May 2007, the victim, then-three-year-old J.B., moved to Denver with her mother and older brother. Dherl Jefferson befriended the children's mother that summer, after which J.B. and her brother occasionally spent time at Jefferson's apartment playing video games and watching movies. The children called Jefferson "Uncle Dherl," and he helped the family financially from time to time. He also babysat the children "about four times" between early 2008 and March 2009. On these occasions, the children's mother would drop them off at Jefferson's apartment at 5:30 or 6 p.m. and then pick them up between midnight and 2 a.m. On two occasions, however, the children spent the night at Jefferson's apartment.

¶5    On March 9, 2009, J.B. disclosed to her mother that "Uncle Dherl" had "touched her in a bad way." Her mother asked whether this had happened more than once, and J.B. replied, "Yeah, every time we're over there." Her mother called the police.

¶6    The next day, J.B. repeated her allegations in more detail to a forensic interviewer. The police then arrested Jefferson, and the People charged him with, as pertinent here, one count of sexual assault on a child (with a pattern-of-abuse sentence enhancer) and one count of sexual assault on a child by one in a position of trust.

3

¶7     Jefferson pleaded not guilty, and his case proceeded to trial. The jury, however, deadlocked, and the court declared a mistrial. The prosecution then decided to re-try Jefferson. This case concerns the second trial, which took place in 2011, more than two years after the abuse had allegedly occurred.

¶8     At trial, then-seven-year-old J.B. could not recall many details about the alleged abuse. The prosecution's case against Jefferson thus hinged on the DVD of J.B.'s forensic interview and on the hearsay testimony of the forensic interviewer and of J.B.'s mother and brother.

¶9     As pertinent here, after the forensic interviewer had laid a foundation for the admission of the DVD of J.B.'s interview, the prosecutor moved to admit it. Jefferson's counsel acknowledged that the DVD was admissible under the statutory hearsay exception for statements of child sexual assault victims, section 13-25-129, C.R.S. (2016), and he stated that he had "no objection to [its] being played for the jury." He objected, however, to the DVD's "being admitted as an exhibit for the jury to consider over and over and over." Asked to clarify the basis for his objection, counsel explained that permitting jurors "to have possession" of the DVD would be "improper and would allow repetition [and] undue emphasis."

¶10    The court overruled the objection, admitted the DVD as an exhibit, and stated that it would allow the jury to review the DVD if and when a juror asked to do so. In so ruling, however, the court did not opine as to whether the jury would have unfettered access to the DVD. To the contrary, the court specifically left that question open and instructed Jefferson to re-raise his objection at the end of the trial, when the court would

4

be able to consider all of the evidence presented and "make [the] particularized finding" required by "the DeBella case." At that time, the court would determine whether, "in [its] discretion," (1) the jury's review of the DVD needed to be supervised (i.e., the jury would need to request access to the DVD) or (2) the jury would "be allowed unsupervised access" to the DVD.

¶11 The prosecutor then played the forty-five-minute DVD for the jury. During the recorded interview, the forensic interviewer asked mostly open-ended questions, beginning with whether "something" had happened. J.B. explained that while she slept on "Uncle Dherl's" couch, he took her into his room and "d[id] that nasty stuff" to her. With J.B.'s input, the interviewer drew diagrams of Jefferson's living room, where J.B. had slept on the couch, and Jefferson's bedroom, where J.B. said Jefferson did "the stuff" to her. When the forensic interviewer asked J.B. to describe "the stuff," she replied that Jefferson "pulled down [her] panties" and then "rub[bed] [her] bottom" with his hand. She also said that "he turned [her] straight" on her back, got "on top of [her]," and did "sex stuff to her." When asked to clarify, she said that he "humped" her. The forensic interviewer then asked J.B. several questions about how Jefferson had "humped" her, and J.B. explained that he sat on her and moved his body "up and down." Asked how this made her body feel, she answered, "Wiggly." After further questioning, J.B. explained that Jefferson "kind of squish[ed]" her "va-jj" (i.e., her vagina) and made her body feel "mad." She was not sure exactly how often Jefferson had touched her, stating at first that it was "two times, I think. Or four" and later that it was "more than one time."

¶12    After the jurors watched the recording of J.B.'s forensic interview, the court admonished:

> Ladies and gentlemen, in this case you just heard an out-of-court statement by [J.B.], which has been admitted into evidence. You're instructed that it's for you to determine the weight and credit to be given these statements.
>
> In making this determination, you shall consider the age and maturity of the child, the nature of the statements, the circumstances under which the statements were made, and any other evidence which will be admitted in the trial which you choose to consider for that purpose.

¶13    The forensic interviewer then finished testifying, and J.B. took the witness stand. With leading questions, the prosecutor prompted J.B. to agree that "[some]thing bad happened when [she] spent the night at [her] Uncle Dherl's house." When asked about the details of the allegations, however, J.B. often answered with "I don't know" or "I don't remember." She could not remember, for example, whether Jefferson had used his wheelchair when he carried her into his room. She did remember, however, that once they were in his room, Jefferson had put her on his bed, "pulled down [her] panties," and "started rubbing [her] butt." On a body diagram, J.B. then circled her "butt." She did not remember whether he had touched her anywhere else that night or whether he had touched her again on a separate occasion. When, however, the prosecutor showed her a second body diagram and asked "where [her] Uncle Dherl's body touched her" when he was sitting on top of her, J.B. circled what she called her "pee-pee." She remembered telling the forensic interviewer that the incident had made her body feel "wiggly," but she could not explain what that meant.

¶14 The next day, which was the last day of the trial, the court revisited the question of whether to allow the jury unsupervised access to the DVD of J.B.'s forensic interview, as it had said it would do. The court noted that the case law, including "the [DeBella] case"[2] and People v. Frasco, 165 P.3d 701 (Colo. 2007), required it to exercise its discretion and to consider certain "factors concerning why the DVD should go to the jury in an unsupervised way." In the court's view, the DeBella factors included (1) "whether or not the videotape was admitted as an exhibit and played for the jury in open court during the trial," (2) "whether inculpatory evidence was introduced at trial in addition to the videotape," and (3) "whether the jury was allowed to take notes which would preserve trial testimony in note form."[3] The court found that all three factors were present, concluded that each one weighed in favor of unsupervised access, and noted that it was exercising its discretion to allow the jury unsupervised access to the DVD in the jury room.

¶15 Jury instructions and closing arguments followed, and J.B.'s forensic interview played an important role in the arguments. The People used J.B.'s recorded words to prove the allegations against Jefferson, and Jefferson argued that the interview was suggestive and that its contents were inconsistent with J.B.'s trial testimony. During her rebuttal argument, the prosecutor then told the jury:

---

[2] The transcript reads "Davila," but it is clear from context that the court meant "DeBella" and either misspoke or was mistranscribed.

[3] These are the factors that the court of appeals division had relied on in DeBella, 219 P.3d at 396–97.

[T]he [DVD] is part of evidence [sic]. And if you want to review it again, you certainly can do so in the jury room. And then you can review it and decide for yourself. And I'm not going to argue about what was said or was not said in the [DVD].[4]

¶16 After the arguments, the court excused the jury to deliberate. About four hours later, the jury returned with a verdict, finding Jefferson guilty of one count of sexual assault on a child and one count of sexual assault on a child by one in a position of trust. The jury further found, however, that the prosecution had not proved beyond a reasonable doubt that Jefferson had committed the sexual assault as part of a pattern of abuse. The court entered a judgment of conviction and, at the subsequent sentencing hearing, imposed an indeterminate prison term of ten years to life with lifetime mandatory parole.

¶17 Jefferson appealed, arguing that the trial court had reversibly erred in giving the jury "unrestricted and unsupervised access" during deliberations to the DVD of J.B.'s forensic interview. Jefferson, ¶ 8. The division ultimately agreed, concluding that although the trial court had affirmatively exercised its discretion when it decided not to exercise control over the jury's access to the DVD, the court had abused that discretion by relying on the factors outlined in the court of appeals division's opinion in DeBella, 219 P.3d at 396–97. Jefferson, ¶ 16. The division viewed the pertinence of the factors

---

[4] Consistent with the trial prosecutor's suggestion that the jurors watch the DVDs again in the jury room, the People have not asserted in this case that the jurors lacked the equipment necessary to take advantage of the unfettered access to the DVDs that the trial court had granted them.

discussed by the <u>DeBella</u> division as "at best, unclear," given that this court later reversed the division's decision. <u>Id.</u>; <u>see</u> <u>DeBella</u>, 233 P.3d at 668.[5]

¶18    Nor did the division deem the factors on which the trial court had relied persuasive on their merits. It regarded two of the factors—(1) that the DVD had already been admitted into evidence and played in open court and (2) that the jury had been allowed to take notes—as "insufficient to support a reasonable conclusion that the trial court need not control the jury's access" to the DVD. <u>Jefferson</u>, ¶¶ 20–23. The division considered the third factor—the existence of other incriminating evidence—irrelevant to the question of juror access and salient only "to whether any error in refusing to restrict such access was harmless or reversible." <u>Id.</u> at ¶ 24.

¶19    In light of the foregoing, the division concluded that the trial court should have exercised "some form of control over the jury's access to, or consideration of, the victim's videotaped statements." <u>Id.</u> at ¶ 18. The division suggested, for example, that the trial court might have (1) replayed the DVD for the jury in open court under the supervision of court personnel, (2) instructed the jury to watch the DVD no more than a specific number of times, or (3) instructed the jury not to give any special weight to the DVD. <u>Id.</u> at ¶ 19.

¶20    The division further concluded that the trial court's error was not harmless because it cast "grave doubt" on the verdict or the fairness of the proceedings. <u>Id.</u> at

---

[5] Jefferson's second trial—and the ruling that is pertinent to this appeal—occurred in March 2011, at which time this court's <u>DeBella</u> opinion had been on the books for almost a year. The trial court's own statements in the second trial demonstrate its awareness of both the court of appeals division's and the supreme court's opinions in that case.

¶¶ 25–26.  In so ruling, the division specifically noted that, like the videotape in DeBella, the DVD of J.B.'s interview had played a "gap-filling role," supplying details of the assault that had been missing from J.B.'s testimony.  Id. at ¶ 29.  The division thus reversed the judgment of conviction and remanded the case for a new trial.  Id. at ¶ 38.

¶21   The People petitioned for certiorari, and we granted the petition to consider their argument that the division misinterpreted our precedent by requiring a trial court to impose restrictions on the jury's access to witnesses' videotaped statements during deliberations.

¶22   We begin by clarifying the issue now before us.  We then address the applicable standard of review.  Finally, we proceed to discuss the merits of the People's challenge.

## II.  The Issue Now Before Us

¶23   As an initial matter, we note that the People characterized the question before us as whether the division had erroneously expanded DeBella to require actual restrictions on a jury's access to testimonial electronic exhibits, rather than a case-by-case analysis of whether restrictions are appropriate.  This recitation, however, misstates the division's holding.  Specifically, notwithstanding the People's argument to the contrary, the division did not require actual restrictions on jury access to electronically recorded exhibits.  Nor did the division expand DeBella.  Rather, as set forth above, the division perceived an abuse of discretion under DeBella because the trial court had relied on factors that, in the division's view, did not alleviate the risk that the jurors would give the DVD at issue undue weight.

¶24 Accordingly, we view the question presented as whether the trial court abused its discretion in allowing the jurors unfettered access during deliberations to the DVD at issue.

### III. Standard of Review

¶25 Control over the use of exhibits during jury deliberations rests firmly within the trial court's discretion, and we may not substitute our own judgment for that of the trial court merely because we would have reached a different conclusion. DeBella, 233 P.3d at 666–67. Accordingly, we will not disturb the court's refusal to exclude or limit the use of an exhibit unless the court's decision was manifestly arbitrary, unreasonable, or unfair. See id. at 667. In affording discretion to a trial court, however, an appellate court may not abdicate its responsibility to review the trial court's determinations. See Morgan v. People, 624 P.2d 1331, 1332 (Colo. 1981) (explaining, in the context of evaluating the competency of potential jurors, that placing discretion in the trial judge does not permit appellate courts "to abdicate their responsibility to ensure that the requirements of fairness are fulfilled"); accord Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review."). A trial court abuses its discretion when it misapplies the law. See Antero Res. Corp. v. Strudley, 2015 CO 26, ¶ 14, 347 P.3d 149, 154.

¶26 Not every abuse of discretion, however, impairs the reliability of a conviction to a degree that requires reversal. DeBella, 233 P.3d at 667. Pursuant to Crim. P. 52(a), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights" is deemed harmless and "shall be disregarded." Thus, when a defendant objects to and

11

preserves a non-constitutional trial error, the reviewing court will overturn his or her conviction only "if the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.'" Hagos v. People, 2012 CO 63, ¶ 12, 288 P.3d 116, 119 (quoting Tevlin v. People, 715 P.2d 338, 342 (Colo. 1986)).

¶27     Here, the parties agree that Jefferson's initial objection preserved the issue for harmless error review, and we address the question presented with that understanding.

## IV.  Analysis

¶28     We begin our analysis by discussing the applicable standards governing jury access to videotaped witness statements during deliberations.  We then apply those standards to the circumstances of this case to determine whether the trial court's decision to grant the jury unfettered access to the DVD of J.B.'s forensic interview during deliberations constituted an abuse of discretion and, if so, what remedy is appropriate to redress the error.  See DeBella, 233 P.3d at 667.

## A.  Jury Access to Videotaped Witness Statements

¶29     "In this jurisdiction we have long adhered to the rule that absent a specific exclusion of some particular class of exhibits, trial courts exercise discretionary control over jury access to trial exhibits during their deliberations." Frasco, 165 P.3d at 704.

¶30     We most recently considered a trial court's exercise of discretionary control over a child sexual assault victim's videotaped statements in DeBella, 233 P.3d at 665–69.  We discuss DeBella in some detail because it controls our disposition of this case.

¶31     In DeBella, the People charged the defendant with sexual assault on a child and enticement.  See id. at 665.  The evidence at trial included two videotaped interviews in

12

which the victim had described the incidents underlying the charges to a detective and to a counselor. Id. Parts of the first videotape and all of the second were ultimately admitted into evidence and played for the jury in open court. Id. At the close of the evidence, the court announced that it intended to provide the jury with a television and the second videotape, thus allowing the jury unconstrained access to the second videotape during deliberations. Id. at 665–66. The court decided not to provide the first tape because it had not been redacted and thus contained portions of the interview that the court had ruled inadmissible. Id. at 666.

¶32 Defense counsel objected to the court's plan, contending that unless the court imposed restrictions on the jury's access to the second videotape, the jury's ability to review the videotape might result in undue prejudice to the defendant. Id. The court overruled this objection, relying on People v. McKinney, 80 P.3d 823, 829 (Colo. App. 2003), rev'd, 99 P.3d 1038 (Colo. 2004), in which the division had stated that pursuant to the amended C.R.C.P. 47(m), a basis no longer existed for prohibiting juror access during deliberations unless such access would be "infeasible." DeBella, 233 P.3d at 666 (quoting McKinney, 80 P.3d at 829).

¶33 The jury eventually found the defendant guilty as charged, and he appealed, arguing, as pertinent here, that the trial court had committed reversible error when it allowed the jury, during deliberations, unfettered access to the videotape. See DeBella, 219 P.3d at 392. Before his conviction was final, this court issued its decision in Frasco, 165 P.3d at 704, disapproving of the application of C.R.C.P. 47(m) to exhibits in criminal proceedings and clarifying that "control over the use of exhibits during jury

13

deliberations in criminal proceedings must remain firmly within the discretion of the [trial] court." The DeBella division acknowledged that Frasco controlled and, applying Frasco's reasoning to the case before it, affirmed. DeBella, 219 P.3d at 393–97.

¶34 In reaching this conclusion, the division determined, as pertinent here, that the trial court's decision to allow the jury unfettered access to the videotape did not unfairly prejudice DeBella because (1) the videotape was admitted as an exhibit and played for the jury in open court during the trial, "thus reducing the likelihood that the jury would place undue weight on it"; (2) the prosecution introduced "significant inculpatory evidence" at trial in addition to the videotape; and (3) the court permitted the jury to take notes, and the jury might have placed greater emphasis during its deliberations on testimony preserved in note form. Id. at 396–97.

¶35 We granted certiorari and reversed. See DeBella, 233 P.3d at 665.

¶36 We began by noting that Frasco had not announced a new rule of law but rather had reaffirmed this court's decision in Settle v. People, 504 P.2d 680, 680–81 (Colo. 1972), in which we had established that trial courts retain discretionary control over jury access to trial exhibits. See DeBella, 233 P.3d at 666. We thus viewed the question then before us as requiring us to decide whether the trial court had abused its discretion in providing the jury with unfettered access to the videotape during deliberations. See id. at 665.

¶37 In addressing this question, we observed that because the trial court felt bound by McKinney, "it thought its hands [were] tied with regard to the jury's access to the tape." Id. at 668. As a result, we concluded that the trial court had made no

14

determination as to whether unfettered access to the videotape at issue would prejudice the defendant and, thus, the court had abused its discretion. Id. at 667–68.

¶38 Turning to the appropriate remedy, we concluded that the trial court's abuse of discretion was not harmless and warranted reversal of the defendant's conviction. See id. at 668. We based this conclusion on the facts that (1) the trial court's failure to exercise some control over the jury's access to the videotape or to specify why such control was unnecessary left us with no record as to how—or even if—the jury reviewed the tape during deliberations; (2) the "nearly silent record" prevented us from determining whether the trial court had fulfilled its obligation to "observe caution" that the videotape was not used in such a manner as to create a likelihood of the jury's giving it undue weight or emphasis; (3) "the videotape was the linchpin of the prosecution's case" because it was the only complete recounting of the charged assaults; and (4) because the victim's testimony deviated from his videotaped statement, the inconsistencies "underscore[d] how central the victim's credibility was to the resolution of the trial, thus heightening the danger of providing the jury with unchaperoned access to only one side of the story." Id. at 668–69.

## B. Application

¶39 Having set forth the governing legal principles, we now assess the People's contention that the division erred in concluding that the jury's unencumbered access to the DVD of J.B.'s forensic interview during its deliberations constituted reversible error. We first consider whether the trial court abused its discretion. Concluding that it did, we then discuss the appropriate remedy.

15

## 1. Abuse of Discretion

¶40　The People contend that the trial court understood the scope of its discretion and properly exercised that discretion "by balancing competing interests" and determining that restrictions on the use of the DVD during deliberations were unnecessary. We disagree.

¶41　Although the record confirms that the trial court understood its duty "to exercise discretion in making [its] findings," the factors that the court ultimately took into consideration do not support the conclusion that it fulfilled its responsibility to guard against unfair or prejudicial use of the DVD by the jury. See DeBella, 233 P.3d at 666; Frasco, 165 P.3d at 703; Settle, 504 P.2d at 680–81.

¶42　As noted above, the trial court culled the factors on which it relied from the court of appeals division's opinion in DeBella, 219 P.3d at 396–97, which opinion we later reversed. These factors included (1) the fact that "the [DVD] was admitted as an exhibit and played for the jury in open court during the trial"; (2) the existence of inculpatory evidence in addition to the DVD, namely, the testimony of J.B. herself and of three hearsay witnesses (the forensic interviewer and J.B.'s mother and brother), all of whom corroborated J.B.'s outcry statements; and (3) the preservation of trial testimony in the form of the jurors' notes, which they could review in the jury room. In our view, however, none of these factors pertained to the trial court's "ultimate objective" of assessing whether the jury's use of the DVD during deliberations might have unfairly prejudiced Jefferson. See Frasco, 165 P.3d at 704–05. We address each factor in turn.

16

¶43 First, an exhibit's admission into evidence occurs in every case that raises the issue of unsupervised access by the jury. If the court does not admit an exhibit, then it would not go to the jury room and no question of unsupervised access would arise. Cf. People v. Harlan, 109 P.3d 616, 624 (Colo. 2005) ("[A]ny information that is not properly received into evidence or included in the court's instructions is extraneous to the case and improper for juror consideration."). We thus agree with the division below that neither the admission of the DVD nor its broadcast during trial alleviated the risk that the jury might place undue weight on the exhibit if allowed unrestricted access to it. See Jefferson, ¶ 20 ("[T]he jury's ability to access (and particularly, to have unrestricted and unsupervised access to) an exhibit after it has been admitted and used before the jury in open court creates the danger of its being given undue weight or emphasis, within the meaning of Frasco and DeBella[.]").

¶44 Second, we disagree with the trial court's analysis of the non-video evidence against Jefferson. Importantly for the trial court, J.B. herself testified, several hearsay witnesses corroborated her outcry, and all of these witnesses were subject to cross-examination by the defense. The statutory hearsay exception for the statements of child sexual assault victims, however, when read together with the Confrontation Clause, effectively required J.B. to testify as a prerequisite to the admission of her out-of-court statements. See § 13-25-129(1)(b)(I); People v. Moreno, 160 P.3d 242, 246 (Colo. 2007). Accordingly, the fact that J.B. testified at trial was not particularly pertinent to a proper assessment of the risk that the jury would place undue emphasis on the DVD of her forensic interview.

17

¶45     Moreover, by repeating what they had heard J.B. say outside of court, the hearsay witnesses only highlighted the inconsistencies between J.B.'s in-court and recorded statements, thereby underscoring the critical nature of J.B.'s credibility to the resolution of the case.  See DeBella, 233 P.3d at 669 ("[T]he inconsistencies between the victim's recorded and trial accounts of the incidents—almost always present in cases such as these—underscore how central the victim's credibility was to the resolution of the trial, thus heightening the danger of providing the jury with unchaperoned access to only one side of the story.").  Thus, rather than alleviating the risk that the jury might unduly emphasize J.B.'s recorded forensic interview—which effectively placed J.B. in the jury room during deliberations, see United States v. Binder, 769 F.2d 595, 600 (9th Cir. 1985) (noting that videotaped testimony "serves as the functional equivalent of a live witness"), overruled in part on other grounds by United States v. Morales, 108 F.3d 1031, 1035 n.1 (9th Cir. 1997)—the hearsay witnesses' testimony likely had the opposite effect.

¶46     Third, the jurors' ability to take notes was immaterial.  Although one of the arguments against note-taking is that jurors may attach too much significance to their written notes and too little to their independent memory of events, see United States v. Maclean, 578 F.2d 64, 66 (3d Cir. 1978), this potential danger does not alleviate the risk that jurors may place undue significance on a videotaped exhibit.  This is particularly true here, given that the trial court did not warn the jury against placing more significance on the DVD than on other evidence.

¶47 Moreover, videotaped exhibits differ in important respects from juror notes. As the trial court stated in its initial remarks to the jury, the jury was required to decide the case "only on the evidence presented at trial." Although the DVD constituted such evidence, the jurors' notes did not. And as the division below explained, the jurors' independent recollections would not prevail over their review of the DVD itself, which was "the equivalent of allowing a witness (not, as in the case of a juror, an impartial decision maker) into the jury room." Jefferson, ¶ 21.

¶48 Lastly, we note that all of the factors on which the trial court relied are virtually ubiquitous in cases like the present one. Specifically, although the decision to allow juror note-taking is discretionary, see Billings v. People, 466 P.2d 474, 478 (Colo. 1970), trial courts are encouraged to permit jurors to take notes in criminal trials, see ABA Standards for Criminal Justice § 15-3.5 ("During the trial of the case, the jurors should be permitted to make notes and keep these notes with them when they retire for their deliberations."); see also COLJI-Crim. B:04 (2016) (pattern criminal jury instruction indicating that jurors may take notes during a trial). Similarly, for the issue of jury access to a child-victim's prior videotaped statement to arise, two things have likely occurred: (1) the trial court admitted the videotaped statement as an exhibit, allowing the party offering the evidence to play it for the jury in open court, and (2) the court likely did so through section 13-25-129, which, as noted above, effectively requires the child-victim to testify at trial. See § 13-25-129(1)(b)(I); Moreno, 160 P.3d at 246.

¶49 For these reasons, a court that measures the potential for undue emphasis by asking whether (1) the videotape was admitted, (2) additional inculpatory evidence

19

(such as the child-victim's trial testimony) was presented, and (3) the jury was allowed to take notes is likely to find all three factors present, regardless of the risk actually presented by giving the jury unfettered access to the recorded statement.

¶50    We are not persuaded otherwise by the People's argument that by granting the jury unrestricted access to the DVD at issue, the trial court implicitly found that the evidence was not unduly prejudicial.  The People advanced a similar, though more nuanced, contention in DeBella, 233 P.3d at 667, arguing that the court's decision to withhold access to one videotape while granting unrestricted access to a second demonstrated "a deliberate calculation in light of all attendant circumstances."  We rejected this argument, however, because the trial court's different treatment of the two videotapes had, in fact, depended on the feasibility (or infeasibility) of providing each to the jury, not on an assessment of the likelihood of prejudice.  See id.

¶51    The trial court's ruling in the present case similarly overlooked the aspects of the case that suggested a likelihood of unfair prejudice.  We thus are compelled to reach the same conclusion that we reached in DeBella, namely, that the trial court did not properly exercise its discretion in granting the jury unrestricted access to the DVD at issue.  The inference that the People urge us to make requires us simply to assume that the trial court had made findings that supported its decision.  Such an assumption, however, would effectively defeat our review for any abuse of discretion.

¶52    We likewise are unpersuaded by the People's argument that in assessing the risk of undue emphasis, the division substituted its own judgment for that of the trial court. As the division recognized, in applying the abuse-of-discretion standard to a trial

20

court's ruling, "[a]n appellate court may not assign error to [the] trial court merely because it would have reached a different conclusion." See Jefferson, ¶ 13 (quoting DeBella, 233 P.3d at 667). Here, however, the division concluded that in refusing to restrict the jury's use of the DVD, the trial court had relied on an erroneous understanding of the applicable law and therefore abused its discretion. Such a ruling did not usurp the trial court's authority to act within the bounds of its discretion. See Antero Res. Corp., ¶ 14, 347 P.3d at 154; Morgan, 624 P.2d at 1332.

¶53    Accordingly, like the division below, we conclude that the trial court abused its discretion in granting the jury unfettered access to the DVD of J.B.'s out-of-court statement.

## 2. Remedy

¶54    The question remains whether reversal is required. As noted above, not all abuses of discretion warrant reversal. DeBella, 233 P.3d at 667. Under the harmless error standard, we will not overturn the jury's guilty verdict unless (1) the record shows that the erroneous ruling substantially influenced the jury's verdict or affected the fairness of Jefferson's trial, see Hagos, ¶ 12, 288 P.3d at 119, or (2) we are left with grave doubt as to the ruling's effect, see Kotteakos v. United States, 328 U.S. 750, 765 (1946) (explaining that an error cannot be harmless if, among other things, "after pondering all that happened without stripping the erroneous action from the whole," the court "is left in grave doubt" as to whether the error substantially swayed the verdict).

¶55    Here, unlike in DeBella, 233 P.3d at 669, the record contains the trial court's explanation as to why it chose to give the jury unfettered access to the DVD of J.B.'s

21

interview and why, in the court's view, the jury was unlikely to give undue emphasis to that DVD if granted such access. After viewing the record as a whole, however, we are left with the same grave doubts that the DeBella court had regarding the effect of unfettered access on the verdict and the fairness of the proceedings. See id.; see also Kotteakos, 328 U.S. at 765.

¶56 Like the trial court in DeBella, the trial court in this case did not (1) give a limiting instruction cautioning the jury against according the DVD any more significance than the other evidence, cf. Frasco, 165 P.3d at 702 (noting that the trial court had given such an instruction), or (2) wait for a jury request to review the DVD, cf. id. (noting that the trial court there had done so). Either of these measures, if undertaken by the trial court, could have mitigated the risk of unfair prejudice from unfettered access to the DVD in the jury room because, had the trial court taken either action, we could have presumed that the jury followed the limiting instruction, or we could have inferred from the jury's request that the jurors had actually reviewed the DVD. DeBella, 233 P.3d at 668.

¶57 The trial court also had the discretion to craft alternative mitigation procedures. See id. at 669. For example, it could have instructed the jury not to watch the DVD more than a certain number of times or required the jury to view the DVD either in open court or under a bailiff's supervision. Id. Absent any of these or similar measures, however, we are unable to evaluate how—or even whether—the jury reviewed the DVD during its deliberations. Cf. id. at 668.

¶58 And although the trial court here attempted to address the risk of undue prejudice in overruling Jefferson's objection to unfettered jury access to the DVD, as noted above, its analysis relied on factors that did not accurately measure the potential for unfair prejudice. Accordingly, the fact that the court exercised its discretion does not allay our doubts regarding the effect of unfettered access to the DVD on the verdict or the fairness of the proceedings.

¶59 The nature of the DVD and the significant role that it played in Jefferson's trial only exacerbate our concerns regarding the verdict and the fairness of the proceedings. Like the defense in DeBella, Jefferson's principal theory at trial was that J.B.'s abuse allegations were not credible. See id. at 669. Moreover, the prosecution introduced no physical evidence of the crime. Rather, its case rested on J.B.'s allegations, which were at times inconsistent and which were supported only by hearsay testimony from her family and government investigators. J.B.'s credibility (or lack thereof) thus became a crucial issue at trial, and the DVD, which contained details that J.B. could not remember when she testified, likely served as the "linchpin of the prosecution's case," just as the videotape in DeBella did. See id.; cf. Binder, 769 F.2d at 600–01 (concluding that the child-victims' videotaped testimony may have taken on "great significance" in the jury room because no physical evidence existed and the defendant challenged the child-victims' credibility by asserting that their charges against him were vindictive). We thus agree with the division below that under these circumstances, the DVD of J.B.'s interview, which contained perhaps the most complete recounting of the alleged abuse, filled the gaps in her trial testimony. See Jefferson, ¶ 29.

23

¶60 With unfettered access to the DVD during its deliberations, the jury was able to watch and re-watch J.B. describe the abuse in a manner functionally equivalent to her live testimony, except with more—and more vivid—detail. Cf. State v. Michaels, 625 A.2d 489, 524 (N.J. Super. Ct. App. Div. 1993) ("The witness' words and all of the animation, passion, or sympathy originally conveyed are again presented to the jury."), aff'd, 642 A.2d 1372 (N.J. 1994). Further, during her rebuttal closing argument, the prosecutor told the jurors to review the DVD and decide for themselves. As a result, the jury is more likely to have followed the prosecutor's suggestion, thereby placing undue emphasis on the DVD. And given the inconsistencies between J.B.'s recorded statement and her trial testimony, as well as the dearth of physical evidence, we believe that the likelihood of such undue emphasis substantially influenced the verdict and the fairness of the proceedings against Jefferson.

¶61 We are not persuaded otherwise by the People's argument that the brevity of the jury's deliberations rendered any error harmless. The jurors deliberated for approximately four hours, which afforded them ample time to watch the forty-five-minute DVD (or at least pertinent portions of it) "over and over and over" (in the words of defense counsel). Cf. Summage v. State, 546 S.E.2d 910, 913 (Ga. Ct. App. 2001) (concluding that an erroneous decision to allow the victim's videotaped interview into the jury room was harmful because, among other things, "[t]he jurors had access to the forty-five-minute tape, arguably the most important evidence introduced by the State, for more than five hours before they reached a verdict"). In any event, as we said in DeBella, 233 P.3d at 668, "[w]here holes in the record [e.g., the absence of evidence

24

regarding whether the jury actually watched the DVD] are the result of the trial court's error and pertinent inquiries on appeal are reduced to exercises in speculation, the lack of record support should not weigh against the defendant's interests."

¶62 Accordingly, we conclude that the error here was not harmless and that it requires the reversal of Jefferson's convictions and a remand for a new trial.

## V. Conclusion

¶63 For these reasons, we affirm the judgment of the court of appeals and remand this case to that court for further proceedings consistent with this opinion.

**JUSTICE BOATRIGHT** dissents.

JUSTICE BOATRIGHT, dissenting.

¶64    Today, the majority retreats from long-standing principles of appellate review to second-guess the trial court's considered decision in favor of its own remote assessment. Even if I agreed that the trial court abused its discretion, because the majority predicates its decision to reverse Jefferson's convictions on an ambiguous record about the jury's access to the DVD, the proper remedy would be to remand to the trial court for clarification, not to reverse the jury's verdict. However, I conclude that the trial court here adequately exercised its discretion in permitting the jury unsupervised access to the DVD of the forensic interview, and I would reverse the judgment of the court of appeals and affirm Jefferson's convictions. Hence, I respectfully dissent.

¶65    Initially, in my view, the record regarding the jurors' access to the DVD is unclear and therefore inadequate for our review. The majority accurately points out that the trial court's final order purported to allow the jury to view the DVD "as they cho[ose] without supervision," and that the prosecution mentioned the video and that the jury could watch it while it deliberated. But it is equally accurate that the trial court's ruling when it admitted the DVD into evidence at a bench conference stated that the jury would have to ask to watch the DVD if it wanted to see it again during deliberations. The trial court never rescinded that order. Furthermore, the record is silent regarding whether the jury had a DVD player or even if the DVD went with the jury into the deliberation room. In my view, this incomplete and conflicting record prevents a thorough review. Hence, if I agreed with the majority that the trial court

1

abused its discretion, I would remand to the trial court for findings on whether the jury had the DVD and a DVD player and whether it asked to watch the DVD during deliberations. But because I conclude that the trial court did not abuse its discretion here, I think a remand is unnecessary and I would affirm the trial court's order and Jefferson's convictions for reasons I now address.

¶66 "[C]ontrol over the use of exhibits during jury deliberations remains firmly within the discretion of the trial court. . . . [A]n appellate court may not substitute its own judgment for that of the trial court where a matter is committed to the trial court's discretion." DeBella v. People, 233 P.3d 664, 666 (Colo. 2010) (citations omitted); see Frasco v. People, 165 P.3d 701, 704 (Colo. 2007); Settle v. People, 504 P.2d 680, 680 (Colo. 1972).

¶67 Notwithstanding the fact that there has never been a proven basis for the assumption that jurors are likely to accord undue weight to videotaped testimony when they have access to it during deliberations,[1] I acknowledge that this assumption is currently the law. To avoid this presumed ill, we have held that trial courts must exercise their discretion in a fashion that ensures the jury does not give evidence

---

[1] This court first expressed a concern over jurors according undue weight to video of a forensic interview in Frasco. 165 P.3d at 704–06 (concluding under circumstances substantially similar to those here that allowing the jury to have unsupervised access to a video of a forensic interview was not an abuse of discretion). The Frasco court acknowledged that Colorado's adoption of the modern practice in 1938 exchanged the old English-rule proscription for a new discretionary determination. Id. at 703–04 (acknowledging this change); see Wilson v. People, 84 P.2d 463, 467 (Colo. 1938) (effecting it). Despite the Frasco court's nod to the general need for caution, nowhere in Frasco did we substantiate that jurors in fact accord undue weight or emphasis to this type of evidence.

"undue weight or emphasis." DeBella, 233 P.3d at 666 (quoting Frasco, 165 P.3d at 703). This is the only line we have drawn in circumscribing trial courts' discretion in this context. See Frasco, 165 P.3d at 704 ("[W]e most certainly did not suggest that trial courts are forbidden from permitting [testimonial evidence] to be taken into the jury room. Nor did we fashion any specific mandate to impose time limitations on jury access or give particular limiting instructions concerning use by the jury."). That we have declined to specify factors, elements, or other considerations indicates to me—and more importantly, to the judges who make these decisions—that trial courts have broad discretion in how they prevent videotaped testimony from unduly influencing jurors. In fact, it is difficult to identify circumstances in which a trial court should be less susceptible to reversal than under an abuse of discretion review of a determination for which there is no prescribed decision matrix. But today, the majority does just that.

¶68 The majority's analysis rests almost exclusively on criticism of the three factors the court relied on in exercising its discretion. It concludes both that this trial court's reliance on the factors in the court of appeals' DeBella opinion constitutes a misapplication of law because we later overruled the court of appeals, maj. op. ¶ 2, and that the factors are inapposite, including because they are likely to be present any time a video of a forensic interview is admitted into evidence, id. at ¶¶ 41–49. I disagree on both counts.

¶69 The majority's conclusion that the trial court in this case misapplied the law, I think, reads DeBella too broadly. To understand DeBella, we need to highlight a few points in its history. In DeBella, we reversed the defendant's conviction because the

3

trial court had allowed the video of the forensic interview to go to the jury without any supervision. DeBella, 233 P.3d at 669. There, the trial court read People v. McKinney, 80 P.3d 823, 825 (Colo. App. 2003), rev'd on other grounds, 99 P.3d 1038 (Colo. 2004), to require it to grant the jury unsupervised access.[2] Id. at 667–68. In reversing the conviction, this court held that it was the trial court's failure to exercise any discretion in giving the jury access to the video that constituted the abuse. Id. at 668 ("[T]he trial court's failure to assess the potential for undue prejudice with respect to the jury's access to the tape was a failure to exercise its discretion, and so an abuse of discretion."). Thus, I read DeBella as having overruled the court of appeals for trying to locate and justify an exercise of discretion by the trial court that did not exist, not because the factors it relied on were inapt. Importantly for the present case, this distinction means that this court has not had the opportunity to weigh in on the propriety of the factors until today; therefore, in this case, the trial court did not misapply the law in considering them. See Frasco, 165 P.3d at 704 ("[T]he precise procedure to be followed [in preventing unfair prejudice] must lie within the trial court's sound discretion.").

¶70  To the majority's conclusion that the factors are inapposite, I see greater merit in the trial court's analysis, and more importantly, I see the trial court exercising its

_____

[2] In McKinney, a division of the court of appeals interpreted a 1999 amendment to C.R.C.P. 47(m) to require that the trial court send an inculpatory, out-of-court written statement from the defendant's coconspirator, which the trial court had admitted into evidence, into the jury deliberation room. McKinney, 80 P.3d at 827–29. Although McKinney was the controlling law at the time of the trial in DeBella, we announced Frasco while the DeBella defendant's appeal was pending, and the DeBella division of the court of appeals applied Frasco's requirement that trial courts exercise discretion in sending videos of forensic interviews into jury deliberations. People v. DeBella, 219 P.3d 390, 393 (Colo. App. 2009), rev'd on other grounds, 233 P.3d 664 (Colo. 2010).

4

discretion in a reasonable manner. The first factor the trial court considered was that the DVD was admitted into evidence and played for the jury during the trial. That factor recognizes that the video previously passed a CRE 403 evaluation, and satisfied the statutory safeguards the legislature prescribed in allowing admission of such videos into evidence, § 13-25-129(1)(a)–(b), C.R.S. (2016). It also demonstrates that the jury had previously viewed the video, thus diminishing any unfair impact of viewing the video during deliberations. In other words, the jury had already seen it, heard all of the other evidence (including cross-examination of the victim and the forensic interviewer), and received counsels' arguments about the probative value of the statements on the DVD.

¶71 The second factor the court considered was the existence of other inculpatory evidence, like the victim's testimony and her outcry to other witnesses. This factor addresses whether and to what extent the video was the linchpin of the prosecution's case—the existence of other inculpatory evidence reduces the likelihood that the jury would accord the video undue emphasis. Indeed, a review of the closing arguments suggests that the parties considered the victim's in-court testimony and her mother's testimony to be at least as significant as the victim's recorded statements on the DVD.

¶72 The third factor that the trial court weighed was that the members of the jury had their notes from the trial memorializing any testimony they felt was important. This consideration addresses whether the jury was equipped to properly evaluate the DVD in the deliberation room and put it in context with all of the other evidence and testimony, i.e., to accord it due weight.

5

¶73     We explained in DeBella and Frasco that "the trial court's ultimate objective must be to assess whether the exhibit will aid the jury in its proper consideration of the case, and even if so, whether a party will nevertheless be unfairly prejudiced by the jury's use of it." DeBella, 233 P.3d at 668; Frasco, 165 P.3d at 704–05. The factors the trial court considered here are tailored to this inquiry and to the question of whether the jury is likely to accord undue weight to the video if allowed to watch it unsupervised. That the trial court considered them demonstrates that it adequately exercised its discretion. While I recognize that the majority's critique provides some guidance for trial courts in exercising their discretion in future cases, I do not agree that the factors the trial court considered in this instance are inapt, let alone so inapt that the trial court's reliance on them automatically renders its decision manifestly arbitrary, unreasonable, or unfair. See Frasco, 165 P.3d at 704 (explaining that trial courts must "assure that juries are not permitted to use exhibits in a manner that is unfairly prejudicial to a party" but that "the precise procedure to be followed to assure this result must lie within the trial court's sound discretion"); People v. Stewart, 55 P.3d 107, 122 (Colo. 2002) (defining what constitutes an abuse of discretion).

¶74     But even if, for the sake of argument, I were to agree that the trial court relied on inapposite factors to weigh the potential for the jury to accord undue weight to the video, I would still conclude that the trial court did not abuse its discretion. In this case, the trial court explicitly and repeatedly demonstrated its familiarity with the controlling case law. It explained to counsel in a bench conference that the DeBella line of cases required it to determine "whether in my discretion I believe the videotape . . . needs to

6

be supervised" such that the jury would have to request the video before the court would consider sending it to the jury,[3] and that it needed to make its determination at the end of the trial in light of all the evidence. Additionally, at the time that the trial court first played the video for the jury, it instructed the jurors that they were to determine the credibility and evidentiary weight the video carried in light of the "age and maturity of the child, the nature of the statements, the circumstances under which the statements were made, and any other evidence which will be admitted in the trial for which you choose to consider for that purpose." This instruction, which comports with the requirement in section 13-25-129(2), assigned to the jurors the responsibility of weighing the video's evidentiary value against the other evidence admitted at trial, i.e., instructed them to accord the video its due weight.

¶75 In my view, the majority is so focused on the inaptness of the factors that it loses sight of the guiding inquiry under the abuse of discretion standard: whether the trial court's steps to ensure that the jury did not afford the video undue weight were so lacking as to be manifestly unreasonable, arbitrary, or unfair. In making that assessment here, we are not asked to "infer" that the trial court exercised its discretion as we were in DeBella. 233 P.3d at 667 (declining to do so). Instead, the record amply demonstrates that the court actually exercised its discretion in a manner adequately tailored to ensuring that the jurors did not accord the video undue weight. Indeed,

---

[3] The record is ambiguous. At the time the DVD was admitted, the court ordered that the jurors would have to request the video from the court before they could view it. The trial court never rescinded this order nor explained how the jury could view the DVD.

based on the combined effect of the court's statutory instruction, its three-factor analysis, its order to counsel at a bench conference that the jury would have to request the video to view it during deliberations,[4] the fact that the jurors swore an oath to uphold the law, and our long-held presumption that jurors follow all instructions absent a showing to the contrary, People v. Truesdale, 546 P.2d 494, 496 (Colo. 1976), I can only conclude that the court's decision was not manifestly unreasonable, arbitrary, or unfair.

¶76    I also dissent from the majority's harmless error analysis.  The majority rests much of its "grave doubt" about the effect of the video on two premises: (1) that the trial court did not issue a "limiting instruction cautioning the jury against according the DVD any more significance than the other evidence," and (2) that the court did not "wait for a jury request to view the DVD."  Maj. op. ¶ 56.  As to the majority's first premise, while the trial court did not expressly caution the jury to avoid giving the DVD undue weight, it did issue an instruction—one the legislature prescribed that, on its face, plainly exhorts jurors to accord the video only the appropriate weight vis-à-vis the other evidence at trial.  See id. at ¶ 12 (quoting the instruction in its entirety).  As to the majority's second premise, I agree that there is no record that the jury ever asked to view the video, id. at ¶ 57, but there is also no record that the jury had access to the equipment necessary to view the DVD, or even that the jury took the DVD into the deliberation room.  To reach its result, the majority must assume that the jury viewed

---

[4] Again, the record is unclear whether the trial court issued this order to the jury, rescinded it, or modified it.

the forty-five-minute video "over and over and over," id. at ¶ 61, becoming transfixed by the video's "[greater]—and more vivid—detail," id. at ¶ 60, thus prejudicing Jefferson. See id. passim.

¶77 Because I believe that the majority is mistaken in its first premise and assumes facts that are unclear in the record in its second, I conclude that any arguable abuse of discretion here was harmless. The fact that the jury acquitted Jefferson of the most serious offense with which he was charged demonstrates that the jury critically weighed all of the evidence and, by extension, strongly suggests that it did not accord the video undue weight. Martin v. People, 738 P.2d 789, 795 (Colo. 1987). Consequently, reversal is inappropriate.

¶78 More generally, when determining whether the trial court's alleged abuse of discretion harmed Jefferson, we should also consider the extraordinary competence of our jurors. The federal and Colorado constitutions guarantee criminal defendants the right to trial by an impartial jury of their peers. U.S. Const. amends. V, XIV; Colo. Const. art. II, § 16. Inherent in this guarantee is an abiding faith that a room full of ordinary citizens is equipped to render just verdicts on a reasoned basis. In my experience, that faith is well placed. Yet I cannot reconcile this cornerstone of our justice system with the cynicism that undergirds DeBella and its predecessors. How can we profess to place our trust in juries when we are convinced that they will be so transfixed, their judgment so overwhelmed, by watching a video that we must exhaustively admonish and supervise them? Cf. maj. op. ¶ 60. We allow juries to have unsupervised access to murder weapons, blood-soaked clothes, bags of drugs, and

9

photographs of grisly wounds and dead victims. Trial courts weigh the danger of evidence unfairly prejudicing defendants every day. I cannot agree that a trial court's discretion is somehow more limited when that evidence is a DVD of a forensic interview—I believe that juries are equally capable of appropriately evaluating this type of evidence too. Cf. United States v. Chadwell, 798 F.3d 910, 915 (9th Cir. 2015) ("The concern for avoiding undue emphasis on particular trial testimony did not limit the discretion of the district court to send the video exhibit to the jury room 'for review like all other evidentiary exhibits.'") (quoting United States v. Cuozzo, 962 F.2d 945, 953 (9th Cir. 1992)) (discussing a police dashboard camera video in which the defendant admits to criminal conduct).

¶79 Finally, I am concerned that the majority opinion is unmoored from the precedential foundation that ostensibly supports its decision. This court began the process of adopting the modern practice almost eighty years ago, Wilson v. People, 84 P.2d 463 (Colo. 1938), and we have since allowed jurors to listen to a recording of a portion of the trial testimony, Settle, 504 P.2d at 680–81, and to watch a video of a forensic interview admitted into evidence, Frasco, 165 P.3d at 706. By the time this court decided Frasco, our law presumed that properly admitted evidence would accompany the jurors into the deliberation room so long as the trial court exercised its discretion in sending the evidence with them. See Frasco, 165 P.3d at 704. DeBella only clarified that a total abdication of responsibility or misapplication of the law would render a trial court's choice to give the jury unsupervised access improper. 233 P.3d at 666–68.

¶80 But today, the majority issues a cautionary tale that no exercise of discretion can be sufficient to allow juries to have unsupervised access to videos of forensic interviews. The majority effectively creates a bright-line requirement that trial courts issue a limiting instruction and supervise the jurors' viewing, whether by requiring them to watch the video in the courtroom, limiting the number of times they can watch it, or taking some other measure. I think this greatly expands, if not outright conflicts with, our holding in Frasco. 165 P.3d at 704 ("[A] deposition-like automatic rule of exclusion for all testimonial exhibits [is a] court-made rule [that] not only no longer finds support in the civil rules but, more importantly, has never been sanctioned by the holdings of this court.").

¶81 I would conclude that the trial court properly exercised its discretion, that if there was an abuse, it was harmless, and that the jury's verdict convicting Jefferson should stand. Alternatively, because the majority predicates its decision to reverse Jefferson's convictions on an ambiguous record about the jury's access to the DVD, I would remand to the trial court for clarification. Hence, I respectfully dissent.